## ALLEN v. FRANCISCO SUGAR CO. et al.

### (Circuit Court of Appeals, Third Circuit. February 15, 1912.)

### No. 61 (1,532).

**1.** CORPORATIONS (§ 68*)—POWERS—CAPITAL STOCK—REDUCTION—PURCHASE WITH BONDS—STATUTORY AUTHORITY.

General Incorporation Law N. J. (P. L. 1896, p. 285) § 27, provides that every corporation organized under the act may increase or decrease its capital stock, change its common stock into one or more classes of preferred stock, create one or more classes of preferred stock, and make such other amendment, alteration, or change in the manner following, and then describes in detail how the corporation may incept and carry out the changes and amendments so authorized, specifying the action to be taken by the board of directors, what by the stockholders, and that two-thirds in interest of each class of stockholders shall vote in favor of the amendment or alteration, etc. *Held*, that such provision conferred statutory authority on a corporation having only common stock to reduce its capitalization by exchanging a part of such stock for bonds to be issued.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181, 183, 449; Dec. Dig. § 68.*]

**2.** CORPORATIONS (§ 68*)—CAPITAL STOCK—RETIREMENT—PURCHASE.

A corporation, in the absence of constitutional or statutory prohibition, has in general an inherent right, for a bona fide purpose, to retire its capital stock by purchase.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181, 183, 449; Dec. Dig. § 68.*]

**3.** CORPORATIONS (§ 68*)—STATUTES—IMPLIED REPEAL—PARI MATERIA—RETIRE-MENT OF STOCK.

General Incorporation Act N. J. (P. L. 1896, p. 285) § 27, authorizing any corporation to retire any kind of corporate stock by purchase at not more than par, was not inconsistent with and was not impliedly repealed by Act March 28, 1902 (P. L. p. 217) § 2, providing for the purchase and retirement of preferred stock, since the latter act operated alone with reference to the retirement of preferred stock and did not affect the prior act so far as it might continue in force with reference to corporations having no preferred stock, and desiring to retire or reduce their capitalization represented by common stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181, 183, 449; Dec. Dig. § 68.*]

**4.** COURTS (§ 366*)—FEDERAL COURTS—STATE STATUTE—CONSTRUCTION.

A federal court, in construing a state statute or in determining whether it has been repealed by a subsequent act of the state, will be governed by the decisions of the highest court of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–968; Dec. Dig. § 366.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

**5.** CORPORATIONS (§ 68*)—CAPITALIZATION—REDUCTION—STATUTES.

General Incorporation Act N. J. (P. L. 1896, p. 286) § 30, provides that the directors of a corporation shall not make dividends except from its surplus or from net profits arising from the business of the corporation, nor shall it divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the corporation or reduce its capital stock except as authorized by law. *Held* that, where a cor-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

poration has voted to decrease its capital stock, the excess of funds or property actually in hand over and above the. amount the company is bound to keep as capital, computed with reference to its nominal capital as reduced, is applicable to the purchase of its own stock for retirement, and hence a scheme for the reduction of the capital stock of a corporation by the issuance of bonds therefor was not in violation of such provision.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181, 183, 449; Dec. Dig. § 68.*]

6. CORPORATIONS (§ 189*)—CAPITAL STOCK—REDUCTION—INJUNCTION—MINORITY STOCKHOLDERS—RIGHTS.

Where a large majority of the holders of the stock of .a corporation had openly adopted and were proceeding to carry out a plan to reduce the corporation's capital stock by the issuance of bonds therefor, in order that one of the stockholders might obtain control and operate the corporation's plantations which were in a foreign country, and all the proceedings were taken openly and in strict accordance with the statutes provided therefor, they could not be enjoined, at the suit of a minority stockholder on the mere allegation that it was a fraudulent scheme to enable such nonresident stockholder to gain control of the corporation to the prejudice of the complainant and other minority stockholders similarly situated.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*]

Appeal from the Circuit Court of the United States for the District of New Jersey.

Suit by William N. Allen, suing in his own behalf and on behalf of all other stockholders similarly situated, of the Francisco Sugar Company, against the Francisco Sugar Company and another. From a judgment sustaining a demurrer to the bill and dismissing the same, complainant appeals. Affirmed.

Louis Marshall .(Samuel Untermyer, on the brief), for appellant.

Sullivan & Cromwell and Lindabury, Depue & Faulks (Richard V. Lindabury and Francis D. Pollak, of counsel), for appellees.

Before GRAY and LANNING, Circuit Judges, and McPHERSON, District Judge.

GRAY, Circuit Judge. The appellant, the complainant below, seeks to review the decree of the Circuit Court of the United States for the District of New Jersey, rendered on June 26, 1911, which sustained the demurrer interposed to the bill of complaint by the appellees, the defendants below, and dismissed the bill.

The bill states that the complainant was a citizen of the state of Pennsylvania, and that the Francisco Sugar Company is a corporation of the state of New Jersey, and Manuel Rionda a citizen of the state of New York; that the defendant corporation was duly organized in 1899 under the provisions. of an act of the Legislature of the state of New Jersey, entitled "An act concerning corporations" (Revision of 1896; P. L. p. 277). The range of objects for which the defendant corporation was incorporated, stated in its certificate of incorporation, as set forth in the bill of complaint, is very large, and the business in which it did engage, to wit, the holding and

cultivation of land in the Island of Cuba, the growth of sugar cane and the production, manufacture and sale of sugar, was clearly within that range. Its corporate powers also expressly included the widest possible incidental powers of buying and selling, leasing, mortgaging real and personal property, and of holding, purchasing, mortgaging, conveying or disposing of all its real and personal property. The bill then goes on to state that, on and after May 4, 1904, the total authorized share capital of the defendant corporation was $1,500,000, each share being of the par value of $100; that of said authorized share capital, there have been issued and are now outstanding 12,277 shares of the par value of $1,227,700. The bill then states that the complainant has been for a number of years the owner of 450 shares of the defendant company's capital stock; that he was a shareholder of the defendant corporation at the time of the transactions and grievances of which he complains; that he was elected a director of the defendant corporation on or about October 9, 1907, and continued in office until on or about October 13, 1909, "and that he became familiar with the affairs of the company"; that shortly after its organization, the corporation acquired, by purchase, its lands in Cuba, for the cultivation of sugar cane; that said lands were acquired at low prices; parts thereof were cleared and prepared for the cultivation of sugar cane, and about 7,000 acres out of 50,000 had been cleared during the past year and now are under cultivation, producing large quantities of sugar cane, of good quality, which yielded a very large amount of sugar, which was sold and disposed of by the corporation at a large profit, and that its output of sugar during the fiscal year ending June 30, 1910, was considerably larger than that for the preceding year. The bill then sets forth with considerable detail the business operations and methods of the company, in producing and making its sugar, and that after making 5 per cent. and 6 per cent. cash dividends from 1904 to 1909 inclusive, in 1910 it made a dividend of 7½ per cent. in cash and 21 per cent. in scrip bearing interest, payable in 4 years from May 15, 1910. The complainant further avers that the earnings of the defendant corporation have been largely in excess of the dividends declared and paid, and that liberal amounts have been charged off for depreciation of lands, machinery and plant; that the corporation's property and assets are without lien or incumbrance, and have never been incumbered, and that the corporation has no indebtedness beyond current bills and accounts, except certain debentures issued soon after the organization of the company, due in 1911; that "in the judgment of the complainant, based upon his familiarity with the affairs of the defendant corporation and his knowledge gained while a member of the board of directors, the book value of the corporation shares, taking into account its actual tangible assets, exclusive of good will and trade marks, over and above all liabilities, is much greater than the par value of the shares; and when the earnings and earning capacity of the corporation are taken into consideration, the actual intrinsic value of such shares is at least several times their par value."

The bill then avers that the defendant, Manuel Rionda, one of the incorporators of the defendant corporation, has for several years owned or controlled 2,277 shares of the corporation's outstanding capital stock of 12,277 shares; that some time prior to the filing of the bill, the defendant "Rionda conceived a plan to acquire the ownership or control of the entire outstanding capital stock of the defendant corporation, or so much thereof as could be acquired, for an inadequate price, and to finance the operation out of the corporation's treasury for his personal benefit." This charge rests upon the statement, that "to that end, said Rionda, on or about August 6, 1909, issued to all the stockholders of the corporation a circular letter, a true copy of which, marked 'Exhibit A'" is annexed to the bill and made part thereof. In it, the defendant, Rionda, states to the stockholders of the defendant corporation that he owns or controls $227,700 of the $1,227,700 of outstanding stock of the defendant company, and offers to the other shareholders of the defendant company depositing their stock with the Morton Trust Company, under an agreement inclosed, to purchase their stock, or cause the same to be purchased and paid for at the price of $125 per share. This price was to be payable either in 6 per cent. collateral trust 30 year sinking fund bonds of a company to be organized under the name of the Francisco Investment Company (such bonds to be secured by the deposit in trust of all the first mortgage bonds and not less than a majority of the stock of the defendant company then outstanding or subsequently issued); or, in the 6 per cent. first mortgage 30 year sinking fund bonds of the defendant company, as provided in the agreement secured by a first mortgage upon the properties of the defendant company. After setting forth other details of the arrangement, the circular letter states that under the proposed agreement, four named persons, or the survivors of them, are appointed a committee to represent the depositors, with the powers specified in the agreement, to protect their interests in connection with the issue of the new securities and the carrying out of the plan. The letter then proposes that the shareholders should deposit their shares with the Morton Trust Company, which will issue temporary certificates therefor, to be exchanged for bonds as soon as the transaction can be completed. That the invitation to deposit is given to all the shareholders of the company, and that the deposit of the stock is made with the understanding that the writer, the defendant Rionda, shall have full power to vote and act upon, and with respect to, the shares of stock deposited in aid of the execution of the plan and purchase, as stated in the agreement, and subject to the supervision of the committee representing the depositors.

The bill avers that the complainant believes that, owing to his expressed objection to so much of the plan stated in the "Offer and Deposit Agreement," as contemplated the issuance of its bonds by the defendant corporation, to enable said Rionda to purchase the stock of the company, and to complainant's threat to take legal measures to prevent such an issue of bonds, the carrying out of said "Offer and Deposit Agreement" has been in abeyance, and that the said Invest-

ment Company has never been organized, and that the defendant corporation has not offered or authorized the issuance of any bonds. The complainant then avers that the said defendant, Rionda, "cast about for other means to accomplish the same, or substantially the same, object as was contemplated by the 'Offer and Deposit Agreement,' and in substance to carry out and effectuate such agreement." That on June 15, 1910, the board of directors of the defendant corporation voted to reduce the authorized share capital of the company from $1,500,000 to $300,000, by means of the purchase for retirement of about 10,000 shares of the stock, such purchase to be made by the issuance of $1,000,000 of 6 per cent. first mortgage 30 year bonds of the defendant .corporation; and a meeting of the stockholders to vote upon said proposal was called, to be held at the company's office in Camden, New Jersey, at noon, on June 27, 1910, of which meeting notice, in the form of a letter signed by the secretary of the defendant company, was sent to all the stockholders. It states that the board of directors, at a meeting held on June 8, 1910, had declared a cash dividend of $7.50 per share, payable on June 30, 1910, to stockholders of record on June 9, 1910, out of the net earnings of the then present fiscal year. It then recites the resolution adopted by the board of directors on June 15th, to purchase for retirement 10,000 shares, or such lesser amount as the company should be able to purchase, of the issued and outstanding capital stock of the company; that it would be the right and privilege of each and every stockholder to exchange his shares of stock to the extent of 81.45 per cent. of his said holdings, or any lesser part thereof at par for 6 per cent. first mortgage, 30 year sinking fund bonds, such exchange to take effect on July 1, 1910, the bonds to be delivered to draw interest from that date. The letter also stated that stockholders entitled to exchange more than $927,700, in amount of stock, having already signified their intention of so doing, the stockholder is notified that a special meeting of stockholders of the defendant company will be held at the company's office on the 27th of June, 1910, for the purpose of taking action upon the proposition to reduce the capital stock of the defendant company from $1,500,000 to $300,000. The bill further avers that on June 20, 1910, the call for the aforesaid meeting of stockholders was rescinded by the board of directors, and a resolution was adopted by the said board, calling a meeting of stockholders, to be held at the office of the company on June 30th, for the purpose of taking action upon the proposal to reduce the authorized capital stock of the company from $1,500,000 to $500,000, instead of to $300,000, of which meeting a notice was sent to the stockholders, in a letter signed by the secretary, advising them of the change in the proposed amount of the stock reduction. The bill then charges, upon information and belief, that the defendant corporation had no right, authority or power to issue its mortgage bonds for the purpose of retiring any portion of its capital stock, and that such proposed and threatened action on the part of the corporation was ultra vires, illegal and contrary to law, and fraudulent in fact; that the proposed reduction was an incident to and part of a scheme

of the said defendant, Rionda, and those who might be associated with him, to obtain control of the defendant corporation and its valuable assets at the expense of the corporation and its stockholders, other than the said Rionda; that the issuance of said bonds would greatly prejudice the complainant or any other dissenting stockholders and greatly reduce the value of their shares and tend to the destruction of the value thereof; and that said proposed and threatened reduction of capital stock by the means aforesaid, is merely a fraudulent and wrongful plan devised by the said Rionda, to enable him to acquire control and ownership of practically all of the stock of the defendant corporation, excepting that owned by the complainant, and to perform on his part the offer and deposit agreement of August, 1909, and to pay for the stock so to be purchased by him by exchanging therefor bonds of the defendant corporation, to be issued as aforesaid; that said plan is not for the benefit of the defendant corporation, or of its stockholders in general, but solely for the benefit of said Rionda and those who may be associated with him in said plan. The bill further charges:

"That the adoption of the aforesaid resolution by the board of directors of the defendant corporation, looking to a reduction of the corporation's capital stock by the purchase for retirement of about ten thousand (10,000) shares of said stock by the means hereinbefore set forth, was and is illegal, wrongful and fraudulent, and in the interest of the said Rionda, and contrary to the interests of the defendant corporation and its other stockholders, and that the scheme which said Rionda is endeavoring to carry out through the corporation's board of directors, and by means of the vote of a majority of its stock controlled by him, is illegal, wrongful and fraudulent."

It then charges that the board of directors of the defendant corporation is entirely under the control of the said Rionda, and application to said board to rescind its aforesaid action would be vain and futile, even if it were possible to obtain a meeting thereof. And the same charge is made in regard to the stockholders' meeting, which it is alleged will be under the control of the said defendant, Rionda.

The complainant then alleges that he has no adequate remedy at law, and is remediless, save by the decree of the court. The relief prayed for is that the defendant corporation, its officers, directors, stockholders, agents and attorneys, and the defendant Rionda, his agents, etc., may be perpetually enjoined from approving or adopting or voting for any plan, or adopting or voting for any resolution to reduce the authorized capital stock of the defendant corporation, or to purchase for retirement any of the capital stock of the corporation, to be paid for by the issue of 6 per cent. first mortgage bonds of the defendant corporation, or by any other means involving the creation of any pecuniary obligation of the defendant corporation which shall rank superior to your orator's shares or tend to depreciate the value thereof.

The grounds of the defendant's demurrer were:
(1) That the bill was without equity;
(2) That the complainant had an adequate remedy at law;
(3) That he was guilty of laches;

(4) That he had not made application to the board of directors or to the stockholders of the defendant, Francisco Sugar Company, for a correction of the alleged grievances of which he complains.

The decree sustaining the demurrer and dismissing the bill was not accompanied by any opinion of the court. The averment in the bill, that the defendant corporation had no right, authority or power to issue its mortgage bonds for the purposes of retiring any portion of its capital stock, and that such proposed and threatened action on the part of the corporation is ultra vires, illegal and contrary to law, raises the fundamental question in this case, and to its discussion the complainant below, as appellant here, has devoted the stress of his argument. If this averment be true, of course the demurrer should have been overruled.

[1] The appellees contend, however, that the transaction sought to be enjoined, so far from being beyond the corporate power of the defendant corporation, was one expressly authorized by the incorporation laws of New Jersey, where the corporation was created. In this proposition, we think they are abundantly supported by a consideration of what seems to us the obvious meaning of those provisions of the corporation law, as enacted by the Legislature of New Jersey, in respect to the reduction of capital stock of corporations by the purchase of the same for retirement.

Section 27 of the General Incorporation Law of New Jersey (Revision of 1896) provides that:

"Every corporation organized under this act may change the nature of its business, change its name, increase its capital stock, decrease its capital stock, change the par value of the shares of its capital stock, change the location of its principal office in this state, extend its corporate existence, change its common stock into one or more classes of preferred stock, create one or more classes of preferred stock, and make such other amendment, change or alteration as may be desired, in manner following:" etc.

The section then prescribes in great detail how the corporation may incept and carry out the changes and amendments thus authorized; what action shall be taken by the board of directors, what by the stockholders, and that two-thirds in interest of each class of the stockholders shall vote in favor of such amendment or alteration, and how the said action of the stockholders shall be certified and become operative, etc.

[2] It is not unimportant in this connection to observe that a corporation, in the absence of constitutional or statutory prohibition, has in general an inherent right, for a bona fide purpose, to retire by purchase its capital stock.

In Burnes v. Burnes, 137 Fed. 781, 788, 70 C. C. A. 357, 364, Judge Sanborn, delivering the opinion of the Circuit Court of Appeals for the Eighth Circuit, uses this language:

"While the powers of a corporation are limited to those expressly granted and those fairly incidental thereto, they include the latter as completely as the former, and they always include the indispensable and the suitable means to exercise the granted powers. In the absence of constitutional or statutory prohibition, corporations have inherent power to buy, to sell, and to retire their own stock. Commissioners v. Thayer, 94 U. S. 631, 643

[24 L. Ed. 133]; City Bank v. Bruce, 17 N. Y. 507, 511; First National Bank v. Salem, Capital Flour Mills Co. (C. C.) 39 Fed. 89, 95; Lowe v. Pioneer Threshing Co. (C. C.) 70 Fed. 646, 647; In re S. P. Smith Lumber Co. (D. C.) 132 Fed. 618, 619; New England Trust Co. v. Abbott, 162 Mass. 148 [38 N. E. 432, 27 L. R. A. 271]. There is no such inhibition in the state of Missouri. The purchase of the 375 shares by the Burnes Estate was, therefore, within its corporate powers, and, as it had authority to buy those shares of stock, it had the corporate power to pay for them either in cash or by its promise to pay the agreed price in monthly or yearly installments during such periods of time as should be fixed by the meeting of the minds of the parties."

It is not surprising, therefore, to find a recognition of this power in the section of the New Jersey Corporation Act, as above quoted, though it is limited by the specific regulations prescribed for its exercise. In section 29 of the same act, the decrease of capital stock authorized in section 27, is specially dealt with, as follows:

"The decrease of capital stock may be effected by retiring or reducing any class of the stock, or by drawing the necessary number of shares by lot for retirement, or by the surrender by every shareholder of his shares, and the issue to him in lieu thereof of a decreased number of shares, or by the purchase at not above par of certain shares for retirement, or by retiring shares owned by the corporation or by reducing the par value of shares," etc.

[3] Here, then, is ample statutory authority for a New Jersey corporation to exercise the not uncommon or extraordinary power of retiring its capital stock by the purchase of a certain proportion of the shares thereof, provided it complies with the conditions and regulations for so doing prescribed in the sections above referred to. Counsel for the appellant does not deny that, under these sections of the New Jersey Corporation Act (Revision of 1896), as they existed prior to 1902, any kind of corporate stock could be retired by purchase, at not above par. It seems, however, to be denied that there has been conferred the right to issue mortgage bonds for that purpose. It is contended, however, with great earnestness, and argued with much ingenuity, that this provision of the Act of 1896, that the decrease of capital stock may be effected by the purchase, at not above par, of certain shares for retirement, which stands without express repeal in the statute to-day, has nevertheless been impliedly repealed by an act of 1902 (P. L. p. 217). This act, approved March 28, 1902, is entitled, "An act to amend an act, entitled 'An act concerning corporations (Revision of 1896), approved April 21, one thousand eight hundred and ninety-six.'".

This act is in four sections. The first amends the sixteenth section of the Act of 1896, so that the same shall read in the manner therein set out. It is concerned with the first meetings of incorporators for organization, and with notice to incorporators, etc., not material to the present question. Section 2 reads as follows:

."2. With the consent of two-thirds in interest of each class of the stockholders present in person or by proxy at a meeting called in the manner provided in section twenty-seven, every corporation organized under this act that shall have issued preferred stock, entitling the holders thereof to receive dividends at a rate exceeding five per centum per annum, and that shall have continuously declared and paid dividends at such rate, on such

preferred stock for the period of at least one year next preceding the meeting, and whose floating or unfunded debt at the time of the stockholders' meeting shall, in the certificate thereof filed with the Secretary of State, be certified not to exceed ten per centum of the par amount of the preferred stock then outstanding, and whose assets at such time, after deducting the amount of its indebtedness, shall be certified in the judgment of the officers making such certificate to be at least equal to the amount of preferred stock issued and outstanding, may, with the consent of the holder of any such preferred stock, redeem and retire the preferred stock of such holder, out of bonds or out of the proceeds of bonds of the corporation, bearing interest at a rate not exceeding five per centum per annum, the principal of such bonds being made payable at a date not less than ten years from the date thereof; every corporation organized under this act may, from time to time, in the manner above provided, issue bonds, which, if therein so declared, shall be convertible at par, at the option of the holder, into fully paid common stock of the corporation at par, within any period therein prescribed not less than two years from the issue thereof; and in such case the board of directors may authorize the issue of the common stock into which such bonds, by their terms, shall be convertible."

Section 3 reads:

"All acts and parts of acts inconsistent with this act are hereby repealed."

Section 4 provides that the act shall take effect immediately.

The contention of counsel for the appellant is, that when the Act of 1902 was passed, it declared the entire law of New Jersey on the subject of the retirement of corporate shares by purchase, and expressly superseded and repealed all acts and parts of acts inconsistent therewith; that it became the substitute for the provision of section 29, relating to the retirement of shares by purchase. To use the language of counsel for the appellant:

"The right of retirement was therefore, in the first place, limited to 'every corporation organized under this act that shall have issued preferred stock entitling the holders thereof to receive dividends at a rate exceeding five per centum per annum.' This was a limitation on the class of corporations which were to have the right to redeem and retire any portion of their stock. The specification of this class of corporations necessarily excluded all others, and hence, also excluded from the right of redemption and retirement the common stock, as distinguished from the preferred stock of the corporation."

We are unable to accept this interpretation of the Act of 1902. Repeal by implication is not favored in law. The grounds upon which it rests must be so strong and convincing as to raise a conclusive presumption of legislative intent, as where the whole field of the prior act is covered by the later one in such mandatory form that the inference that the later act is to be a substitute for the former, cannot be avoided.

"If both acts can stand together, both shall stand, but if they are so repugnant to each other that both cannot stand together, the former gives place to the latter."

Section 29 of the Act of 1896 authorized the decrease of capital stock, by retiring or reducing any class of the stock, common or preferred. Section 2 of the Act of 1902, while interfering with no vested right of a preferred stockholder, prescribes a different mode by which such stock might be reduced or retired or purchased with the

bonds of the corporation, the requirements to be complied with being such as seem calculated to protect the interests of the corporation, of stockholders, of creditors, and of the public. The amendment of 1902, by its terms, is expressly applicable, and only applicable, to corporations that shall have issued preferred stock, and the change in the method of retiring the stock was only imposed on corporations having that class of stockholders. Thus confined, the act cannot apply to corporations having only common stockholders who were authorized under the Act of 1896 to retire the same. Surely it is a violent presumption for which the appellant contends, that legislation prescribing a method for the retirement of one class of stock should repeal the existing law as to another class of stock. Both provisions may stand together,—the Act of 1902 superseding the method by which preferred stock could have been transferred under the Act of 1896 and the provision by which, under the last named act, common stock might be transferred.

Nor can the canon of construction, that a special act will be treated as superseding an earlier general act, be successfully invoked by the appellant in support of the conclusion which he is seeking to establish. The general Act of 1896 provides that any class of stock, common or preferred, may be retired by purchase. The special act relates only to that part of the general act authorizing the retirement of preferred stock. It is an exception to the general provisions of that act. It cannot refer to or affect the general act in any particulars not covered by the special act. This canon of construction is founded on reason and common sense, and both must be regarded in its application.

[4] We fail to find in the consideration of the statutes themselves any ground upon which can be founded an implication of repeal by the statute of 1902, of the twenty-seventh and twenty-ninth sections of the statute of 1896. As, however, in a federal court a state statute means what the highest court of that state says that it means, we have examined with great care the case of Berger v. United States Steel Corporation, 63 N. J. Eq. 809, 53 Atl. 68. This case was elaborately discussed by counsel on both sides at the argument, who drew different conclusions as to its bearing upon the question here at issue, viz., whether the Act of 1902, above quoted, so modified the previously existing law as to limit the retirement of stock by means of bonds to the retirement of preferred stock, and thus repeal by implication the provision of the Act of 1896, by which common stock could also be thus retired.

We have already indicated our independent view as to how far the Act of 1902, in regard to the retirement of preferred stock, affected the general provisions of the twenty-seventh and twenty-ninth sections of the Act of 1896, in regard to the retirement of capital stock, whether preferred or common. It remains to consider whether, in the case referred to, the court has so dealt with the construction and effect of these statutes as to require from us any change or modification in the view we have above expressed. In the Berger Case, a defendant corporation was sued by a dissenting preferred stock-

holder, to enjoin a proposed issue of bonds in exchange for preferred stock. The trans-tion was incepted directly after the passage of the Act of 1902, and the method of procedure prescribed by that act for accomplishing the retirement was being complied with. It was contended for the corporation that the transaction was authorized by section 29 of the Corporation Act, of the revision of 1896, and in the alternative by the special Act of 1902, authorizing the purchase of preferred stock with bonds. The complaining stockholder replied, first, that section 29 did not authorize the issue of mortgage bonds in payment for stock, and, second, that the Act of 1902 was unconstitutional, because it interfered with the vested rights of stockholders to object to a purchase of stock with bonds. We think the counsel for the appellees were right in saying that the Court of Errors and Appeals assumed for the purposes of the case that the Act of 1902 would have been unconstitutional if it had created a new right to issue bonds for stock, and that they sustained the transaction on the ground that section 29 of the Act of 1896, in itself, authorized such an exchange, and that the Act of 1902 was a mere regulation of a pre-existing power to issue bonds in exchange for stock.

This decision of the highest court of the state of New Jersey seems to us to put beyond the region of controversy, not only the question whether the Act of 1902 repealed by implication the provision of section 29 of the Act of 1896, whereby 'corporations having only common stock might retire the same by purchase, but also the question, whether, in retiring their common stock, such corporations may, under the provisions of said act, issue bonds for that purpose. As counsel for the appellant contends that these questions were not in issue or necessary to be decided by the court, a somewhat extended extract from the opinion in that case becomes necessary:

"The question to be solved is whether the 'act concerning corporations,' in connection with the certificate of incorporation filed under it, contains a grant of power to retire shares of stock in the manner adopted by the board of directors and ratified by the vote of the stockholders.

"The twenty-seventh and twenty-ninth sections of the Corporation Act of 1896 expressly provide for the retirement of both classes of stock.

"The fifth section of the act provides 'that this act and all its amendments shall be a part of the charter of every corporation heretofore or hereafter formed under it, except so far as the same are inapplicable and inappropriate to the objects of such corporation.'

"The complainant, therefore, has no vested right to retain her shares in opposition to any lawful method provided for retiring them. Nor, under the provisions of our corporation act, can any just basis be found for the assertion that her vested rights as a stockholder are impaired by the purchase by the corporation of its own shares of stock.

"In Chapman v. Ironclad Rheostat Co., 62 N. J. Law, 497 [41 Atl. 690], Mr. Justice Dixon, in an opinion delivered in our Supreme Court, very clearly demonstrates that, under the Corporation Act of 1896, there is an implied grant of power to corporations to purchase shares of their own capital stock whenever such purchase is required for legitimate corporate purposes. Section 20 makes such shares personal property; section 1, subdivision 4, gives power to purchase such personal property as the purposes of the corporation shall require, except what is excepted in section 3, which exception does not include shares of its own stock. Therefore, in connection with sections 29 and 38, the right of a corporation to purchase its own shares is necessarily implied.

"This right is also so fully recognized by the twenty-ninth section, that it seems to be removed from debatable questions. That section provides that capital stock may be decreased by retiring shares owned by the corporation, which' unquestionably implies the power to acquire and hold its own shares.

"The first question to be considered is whether the appellant has power, under the act of 1896, to retire its shares in the proposed method which is now challenged by the respondent.

"That act provides several ways in which stock may be retired by a vote of two-thirds in interest of each class of stockholders:"

After a discussion of these several ways, the court says:

"The corporation act gives express power to retire shares by purchase, and that provision must be read into the certificate of incorporation, under and subject to which the complainant holds her stock. It cannot, therefore, be even plausibly maintained that shares cannot be purchased for retirement by cash.

"But it is contended that the appellant is without authority to issue bonds with which, or with the proceeds thereof, it purposes to effect the purchase.

"There is no provision in the corporation act, or in the charter of the company, to support the proposition that purchases of its stock cannot be made by it on credit."

The court then proceeds with an argument to show that, as a necessary consequence and corollary of the right to purchase, credit may be given for any time convenient to the parties contracting, and by an elaborate and well-considered course of reasoning concludes, that "the right to create' a debt also carries with it the right to secure it by mortgage, or otherwise, in the absence of any statutory, restraint upon the corporation," and that therefore, under the Incorporation Act of 1896, a corporation may purchase its own stock, either preferred or common, with the intent to retire the same, either for cash or by issuing its own bonds, secured by mortgage, in exchange for such stock. This being so, the court decides that no vested right of the complainant stockholder was interfered with by the Act of 1902, prescribing specifically that preferred stock might be exchanged for bonds secured by a mortgage, because . retirement in that mode was already provided for under section 29 of the Act of 1896. By this express and necessary holding as to the proper interpretation of these statutes, the contention of counsel for the appellants, that the previously existing law is so modified by the Act of 1902 as to limit the retirement of stock by means of bonds to the retirement of preferred stock in that manner, and that therefore the retirement of common stock by that method is excluded, is negatived.

But counsel for the appellant insists that, whatever the court said with respect to the interpretation of section 29 of the Act of 1896, was only said for the purpose of indicating that the Act of 1902 did not interfere with a vested right, and, "far from injuriously affecting any vested right of a stockholder, tended to limit the power which previously existed, and hence was not subject to the constitutional objection on which the complainant in that case relied." The position of counsel for the appellant appears to be this: That the complainant in the Berger Case took her stock under the provisions of the Act of 1896; that the rights attaching to her status as stock-

holder under that act could not be changed to her detriment by subsequent legislation; that the Act of 1902 provided that certain preferred stock might be retired in a certain way prescribed in the statute, by purchase, and bonds might be issued by the corporation to be given in exchange therefor; that the court decided that the rights of complainant were not affected in any way by this provision which permitted a corporation to purchase its stocks with bonds issued for that purpose, because, under the Act of 1896, they might have been retired in the same way; her rights in that respect had therefore not been changed by the Act of 1902; that the act was therefore constitutional, as not divesting complainant of her status as a stockholder, acquired under the Act of 1896; and counsel's contention is, that by this decision it was not necessary for the court to hold, and that it did not hold, that the twenty-seventh and twenty-ninth sections of the Act of 1896, in regard to the retirement of stock, were still in force, and were not repealed or superseded by the Act of 1902, and argues from certain language used by the learned judge who delivered the opinion of the court, that what the court meant, and all that it meant, was that, though the Act of 1896 in these respects had been repealed and superseded by the Act of 1902, the rights previously acquired under the former act could not be constitutionally divested or abrogated by the later act. Excerpts, therefore, from the opinion in the Berger Case are cited, as clearly indicating that the Court of Errors and Appeals considered the Act of 1902 as excluding all other methods for retiring shares by purchase. Without quoting the language thus referred to in extenso, it is only necessary to observe that Mr. Justice Van Syckel, in discussing the effect of the Act of 1902, does not always find it necessary in a long opinion to repeat constantly that the act deals only with the retirement of *preferred* stock, and is made expressly applicable only to corporations having preferred stock. Thus, in the excerpt from the opinion made by counsel, it is said:

"The Act of 1896 gave the appellant the right, by a two-thirds vote of its shareholders, to retire *preferred* stock by purchase. The Act of 1902 preserves that right, merely regulating the manner in which it should be exercised."

Clearly when, further on in the opinion, the court says:

"The fact that the Act of 1902 excludes all other methods for retiring shares by purchase, and the provision that it cannot be applied unless it is made to appear that the assets," etc.

—it was assumed by the writer of the opinion that reference was made only to the retirement of preferred stock, as regulated by the Act of 1902, and it was not necessary to constantly repeat in words that assumption.

The contention that the Act of 1902 superseded and repealed, or was intended to supersede and repeal, all the provisions of the Act of 1896, in regard to the retirement of corporate shares by purchase, and in this respect became a substitute for the provision of section 29, is at variance with the whole trend of the opinion and the interpretation applied to the legislation in question by the Court of Er-

rors and Appeals in the Berger Case, in the respects we now have under consideration. In addition to the positions taken in that court in relation to the bearing of the Act of 1902 upon the provisions of sections 27 and 29 of the Act of 1896, as above referred to, the court, in concluding its discussion of what the Act of 1896 permitted, in relation to the issuance of bonds secured by mortgage for the purchase of shares for retirement, uses this language:

"If, on this branch of the case, it had been concluded that in some material respect, the provision of the Act of 1896 had not been pursued, the Act of 1902, which had been strictly followed, is valid and constitutional."

This language is hardly consistent with the meaning attributed to the court by counsel, that it held the provisions of the Act of 1896, in regard to the retirement of stock, whether common or preferred, as wholly superseded by the Act of 1902.

The court then proceeds to another branch of the case, viz., whether the Act of 1902 is a special act. After the full discussion of the contentions, pro and con, it decides that it is not a special act, with reference to the Act of 1896, and after dealing with questions peculiar to the case in hand, and not material here, concludes with the language already quoted:

"The act of 1896 gave the appellant the right, by a two-thirds vote of its shareholders, to retire preferred stock by purchase; the Act of 1902 preserves that right, merely regulating the manner in which it should be exercised."

We think it clear, from what has been already said as to the decision in this case, that the court has necessarily assumed that sections 27 and 29, in regard to the retirement of the capital stock of corporations, is still in force, except so far as the method to be pursued when the retirement of preferred stock is to be effective is concerned, and that the right of retirement is still recognized as existing under the Act of 1896. The language just quoted and relied on by the appellant, is entirely consistent with the view we have here taken, of what was decided by the Court of Errors and Appeals of New Jersey in that case.

[5] The appellant also contends that the proposed transaction is a withdrawal of capital in violation of section 30 of the Act of 1896. This section provides that:

"The directors of a corporation shall not make dividends except from its surplus or from net profits arising from the business of such corporation, nor shall it divide, withdraw or in any way pay to the stockholders or any of them any part of the capital stock of such corporation or reduce its capital stock except as authorized by law."

We think that a consideration of this section and the judicial interpretation that has been given to it by the courts of New Jersey, make it entirely plain that the excess of funds or property actually in hand, over and above the sums which the company is bound to keep as capital, must be computed with reference to its nominal capital as reduced. In this view, there can be no dispute that there is a surplus applicable under the law to the proposed retirement of stock. It is to be observed, also, that in this very section, the inhibi-

tion upon the reduction of capital stock, except as authorized by law, is quite apart from the other inhibitions of the section. In this case, the defendant corporation is authorized by law to reduce its capital.

In Continental Securities Co. v. Northern Securities Co., 66 N. J. Eq. 274, 57 Atl. 876, the Court of Chancery, in dismissing the bill, said:

"By the reduction of the capital stock of a corporation not impaired by losses, there must necessarily occur a surplus of assets to the extent of the reduction, and unless the rights of creditors would be effected thereby or the capital impaired, it becomes the duty of the directors to make an equitable distribution of such surplus or so much thereof as the carrying on of the business for the best interests of the stockholders may not require. Strong v. Brooklyn R. R. Co., 93 N. Y. 426; Williams v. W. U. Tel. Co., 93 N. Y. 163; Morawetz on Corp. 453. The proposed distribution is not a dividend in the sense intended by the statute, but a division of surplus capital rendered useless for the purposes usually attributed to capital, because the issue of stock which it represented has been canceled."

See, also, Strong v. Brooklyn Railroad Co., 93 N. Y. 426, where the court, in considering what restraint a precisely similar provision to that contained in section 30 of the New Jersey Incorporation law, imposed upon the right of the corporation to decrease its capital stock by purchase of outstanding shares, said:

"In such a case, the excess of its funds and property actually in hand, over and above the sums which the company is bound to keep as capital (viz., its nominal capital as reduced), is converted into a surplus fund which it can dispose of by dividing it among its stockholders."

See also, Cook on Corp. § 289, vol. 1, p. 787, 4th Ed.

[6] Though, as we have said, the stress of the argument has been placed upon the averment in the bill, that the contemplated retirement of the capital stock of the defendant corporation by purchase with bonds of the defendant, issued for that purpose, is ultra vires, it remains to notice the contention of appellant, that:

"The scheme assailed in the bill is fraudulent as against the complainant, and its effectuation should be restrained."

As this case is being considered upon a demurrer to the bill, the facts pleaded, or necessary deductions therefrom, must sustain the charge that the contemplated acts of the defendant sought to be restrained are so fraudulent as to equitably entitle the complainant to the relief asked for. We need only refer to the averments of the bill already summarized.

The averment that the defendant corporation, its stockholders and directors, in preparing or threatening to carry out the reduction of capital stock, as heretofore explained, were in fact carrying out a "scheme" of the defendant Rionda, by which he intended to obtain stock control of the corporation, may be taken as true. It may also be taken as true that, if all the other stockholders except Rionda and the complainant should surrender the proposed proportion of their stock, as set forth in the circular letter signed by the secretary of the corporation, requesting such surrender, Rionda's 2,227 shares retained by him would give him a controlling stock interest in the company. It may also be accepted as true that Rionda intended to pro-

duce this result by the said proposal, and that his own interests were the impelling motive for his conduct in this regard. Do these facts of themselves support the charge of fraud made by the complainant? We think not. The mere characterization of these acts as fraudulent adds nothing to the strength of the complainant's case. The so-called "scheme" disclosed by these facts, is one in which the defendant, Rionda, the board of directors and all the other stockholders, except the complainant, joined and co-operated. There is nothing in the facts as averred in the bill to show that this plan of the defendant, Rionda, and of all the other stockholders, except one, together with the board of directors, was otherwise than for the benefit of the corporation and of its stockholders. The whole proceeding by which this sought for reduction of capital stock was being effectuated, was in strict conformity to the law of the state by which the corporation defendant was created. Every step set forth in the bill for the effectuation of this plan, was an open one and publicly proclaimed to all concerned. No stockholder is alleged to have been deceived by what was intended by any of the defendants. The first circular letter of Rionda to the stockholders, together with the offer and deposit agreement, which was an exhibit and made part of the bill, states frankly the amount of capital owned by Rionda at that time, and so states his proposal as to leave perfectly clear what the situation would be if deposits were made by all the other stockholders, and he, Rionda, continued to hold, without deposit, his own stock. The abandonment of the deposit plan of reducing the capital stock, was presumably because it was not in strict compliance with the requirements of the law. The withdrawal of this offer and the letters in relation to the present plan for retirement of stock of June 15, and June 20, 1910, are also exhibits and made part of the bill of complaint. These letters are circular letters, intended to be read by every stockholder, in which the whole plan referred to in the bill of complaint is set forth in detail. They plainly set forth a proposal to retire the stock in such proportion that if all the stockholders, except Rionda and the complainant, shall consent thereto, Rionda's stock holding will give him a stock control of the corporation. No stockholder, as we have said, could have been deceived by what was proposed in this offer. The corporation, with the assenting stockholders, in the mode prescribed by the corporation law of New Jersey, had a clear right to do the thing that was proposed to be done. The financial condition of the company had been set forth in a letter to the stockholders by the committee of directors who were forwarding the plan in its inception, and we quote the same, as follows, as an exhibit accompanying the bill:

"To the Stockholders of the Francisco Sugar Co.

"Gentlemen: We have a valuable property and for nearly ten years we have given to it our best service. It is now in a splendid shape, but we have come to the conclusion that we cannot continue to manage it in a satisfactory manner on account of the distance and in a foreign country and having no one who can remain on the property who has qualifications to manage such a large or such a comprehensive business.

"It requires about three hundred thousand dollars ($300,000) to pay the ex-

penses during the dead season and until we receive any cash from the next crop.

"After several years of effort we have received the accompanying offer of Mr. Manuel Rionda, dated August 6, 1909, which we consider a good one and we recommend you to accept. It will pay 7½ per cent. on your investment and is secured by a mortgage covering all the property the company now owns, which includes over 50,000 acres of land, a complete sugar factory, railroad, wharf, large general store, dwelling and offices, tenant houses, etc., etc. We consider the security good and the proposed buyer and his family have had much and successful management of sugar properties in Cuba and we believe will run it successfully.

"Mr. Craig's health will not allow him to continue as president, and Mr. James M. McCahan finds that he cannot continue as vice president.

"W. J. McCahan,
"Jas. W. Cooper,
"Jas. M. McCahan,
"Philadelphia, August 6th, 1909.                    John F. Craig."

In the absence of any facts well pleaded, which, if true, would impute fraud to the defendant, we cannot, on a mere suggestion of interested motives on the part of the defendants, in attempting to carry out their proposal, by bringing about a retirement of stock permitted and favored by the law, and in the mode and manner prescribed by the law, find any equity in the complainant's position that would entitle him to the relief sought by the bill of complaint. It does not need the array of authority cited by the counsel for the appellees to establish the proposition that, in the respects herein under consideration, the majority of the stockholders are not trustees for a dissentient stockholder, and have a clear right to vote on the ground of what they consider their own interests, in the acceptance or rejection of the offered plan for reducing the stock of the corporation. It seems to be a clear case of a mere difference of opinion between a large majority of the stockholders and the dissentient stockholder, who is the complainant. If the defendant should hereafter abuse the power he has acquired by ownership of the majority of the stock of the defendant corporation, the complainant, or any other minority stockholder, has ample remedy to restrain such abuse of power and obtain redress therefor by public or private suit. But the mere averment that power lawfully obtained may be, or often is intended to be, thereafter unlawfully or oppressively used by the defendant, presents no ground for equitable relief.

On the whole case, we are of opinion that the demurrer to the bill of complaint was properly sustained, and the decree of the court below is affirmed.